Our next case this morning is number 14-2700, EqualEmploymentOpportunityCommissionV Mr. Ramshaw? May it please the Court, Paul Ramshaw for the Commission as the Appellant. Do you reserve time for rebuttal? Oh, I'm sorry. Yes, please. Five minutes. Correct. The legal issues here are unusual because the facts are unusual. And just reviewing them very briefly, 6,000 employee agents had great employee benefits and their financial security depended on their employee benefits and their retirement and their renewal commissions in large part. Allstate tried to get them to convert to independent contractor status voluntarily for nine years and very few of them did. And so Allstate decided to take that choice away from them, fired them all, leaving them with no employee benefits or renewal commissions. All right, and then there were four options. Right. And as I understand it, the Commission's position, you concede that employers have the right under the anti-discrimination laws to obtain releases in exchange for severance payments that would not otherwise be due in owing. Is that correct? Yes. So does that mean then you're only challenging option one, the conversion option? Yes, we're only challenging option one. All right, well, if it's okay to offer a sweetener in terms of severance payments without future business engagement between the former employer and former employee, how can it be reasonable to say that it's illegal to give them a sweetener that includes continued work between the former employee and former employer in the form of an independent contract? Because if that were lawful, employers could immunize themselves from the statutes. If an employer can say, and I think that's the central issue here, can an employer lawfully say to its employees, we're firing you? You're fired, right? But I don't understand your position to be that Allstate couldn't just fire everybody. You're not challenging that, are you? No, and that's not what happened here. Well, that's when the real harm is done, right? When I get fired and all my colleagues get fired, we're all out of work. That's about as bad as it gets, right? Well, here with option one, which Allstate wanted the bulk of its employee agents to convert to independent contractors, and the bulk of them did. Which would seem to suggest that they offered them a pretty attractive deal, right? Because if it weren't attractive, then they would have taken option two, three, or four, as some did. That's right. It was an attractive deal. So you want – I guess I'm challenging on this because it seems a little bit irrational to be challenging the most attractive option while conceding that the less attractive options are lawful. But maybe that's what the law requires. Even if it were – I'm not sure that we can make that assessment. But assume for a minute that option one was the economically most attractive option to them. The question is whether it's lawful for an employer to say, if you want to keep working for me, you have to release all your claims. What's the protective activity? The protective activity in this case is maintaining your rights under the ADEA in Title VII. What you've alleged here is the protective activity is the refusal to sign the release. Right, which is the only way you could maintain your rights under Title VII in the ADEA was to refuse to sign the release. And that's the message it gave. I agree. There are all sorts of cases that say normally a refusal to sign a release is not a protective activity. That's in the context of a normal termination setting, when a few people or many people are fired but they're not staying with the company. And they get severance benefits. And severance benefits are benefits that you give to a former employee to help them because they're not continuing their economic relationship with you, the employer. And that's clearly not what happened here as to the employee agents who became independent contractors. Aren't they entering into a materially different employment relationship as independent contractors? Yes, they are. Is it not significant? I mean, if option one were the only way you could continue it as an employee was to sign the release, that would be an even clearer case, we believe, of an unlawful attempt to exempt yourself from the statute,  but the fact that they became independent contractors here, just like in Eshan, it does not prevent what they did from what they did to the employees as being retaliatory. Because as to the employees, the only way they could avoid financial ruin was to sign the release. That's what Judge Buckwalter found, that this was a hobson's choice. Given that they were going to lose their renewal commissions, lose their employee benefits, they... But they got other benefits, like a job, if they signed the release. If they signed the release, yes. And the question is whether an employer can say, to keep on working for me, you have to release your claims. Because if you can do that once, you could do it periodically, and then you could immunize yourself from the statute. You use that phrase, keep on working for me, and it seems to run into the important legal distinction. It may not be a factual distinction, because the facts, I think, support your position. These agents who converted continued working for or working with Allstate. But when it comes to the legal side of things, there is, is there not, a material difference between a master-servant relationship, employer-employee, and independent contractor? The law makes a very important distinction between those two different statuses, does it not? Yes. So how do you get around that? Because I noticed in your briefing, you sort of very artfully finessed the language, working for, working for. Continuing their career. Yeah. I mean, it was... I tried. I thought you dressed that up as well as anybody could have, I think. But I'm having trouble accepting the elision that just breaks down the legal distinction between employer-employee, on the one hand, and independent contractor on the other. But in some ways, that almost makes it worse. Because if they were going to continue as employees, then after signing a release, they would still be covered by the statutes as to future discrimination. And here, they're becoming independent contractors, and they won't be covered by those statutes after... But being an independent contractor is being no better than being nothing. And when they're all summarily fired, they're all, they're nothing at that point. They have nothing to hold on to, right? Yes. Yeah. But again, the fact that they... You're saying... It's almost as if the commission is... Well, I guess the commission is banking on the fact that a company like Allstate wouldn't just fire everybody and then ignore them. Because you're banking on the fact that they still have to run a business, and they're going to need to try to get these people back. Yeah, I think that's clear from the facts here. That's not just a general assumption. I mean, Allstate did want these people. They had been trying for nine years to get them to convert to independent contractors. And in this program, they wanted the bulk of them to convert, and the bulk of them did. Let me briefly talk about the text of the statute. The district court said there's no violation here because the text of the anti-retaliation provisions doesn't say you can't exempt yourself from the statute. But I don't think Congress should have to say that. I think it's implicit in when Congress... In other words, I would be saying that every time Congress passes a law saying employers can't do X, then they also have to write a separate section that says, and you can't exempt yourself from this prohibition we just enforced. The fact that you have the prohibition in place means Congress meant the employers to be subject to it and it should not be lawful for them to exempt themselves from the statute. Did they? I'm sorry? Did they? Did they try to exempt them from the... They didn't say you can't continue to bring in any EEOC client. The release didn't say that. No, and in fact, many of them filed charges and some of them sued. And they were not terminated because of that. So that would be clear retaliation. But they did require them to sign the release. And that release has made a huge difference in their rights to enforce, to challenge the program itself as a violation. I mean, if you look at the companion, private class action, they're looking now at a trial 13 or 14 years later, and the trial is just going to be on whether the release is valid. But you have it placed here. I mean, you didn't move for summary judgment on the invalidity of the release. So I don't see that you've challenged it here. That's the relief we would want if... Well, that's being litigated in Romero, right? That's what the judge has to decide. Yes, yes. That's what the jury has to decide. In the Romero cases. But here, I'm just saying, the EEOC... It's not a party in those cases. No, but it... So you're not challenging the validity of the release here. No, we are, Your Honor. Isn't that really the issue in this case, though, the validity of the release? Yes, yes. Rather than a substantive retaliation. Well, to invalidate the release, we have to show that they did something unlawful. And our contention is what was unlawful was requiring the release in order to continue working with the company. The employers can't do that. And because they can't do that, the release is invalid. And it shouldn't have to go to a trial. Judge Buckwalter found that even if the release is valid, and he has problems with the releases. He's made it very, very clear. It doesn't constitute substantive violation of the retaliation, the discrimination laws that are invoked in this case. He found that. That's why he didn't pay much attention to our law of the case in 2009 that says the validity is the first issue, because he didn't have to reach it. Even if the releases are valid, there's no substantive retaliation here. Okay. I'm sorry. I'm over my time. That's why he went to the merits. Yes, and we are challenging that ruling in this case. We'll hear you on rebuttal, Mr. Ramshaw. Thank you. Mr. Livingston? Good morning. I'm Don Livingston on behalf of Allstate Insurance Company. I think where I'd like to jump in here is with Mr. Marengoff's statements that if you rule for Allstate, then you would permit employers to exempt themselves from anti-discrimination statutes by serially imposing releases on their employees as a condition of employment. The fact is that such an exemption or immunization would be absolutely impossible. The question of enforceability of discrimination releases has been before the courts for 30, 35, 40 years. In this court, in Coventry v. U.S. Hill, the question was could individuals sign age discrimination releases at all without the EEOC having supervised them. And the court decided that, yes, that older workers can sign releases of their ADA claims, but it imposed protections for them. And the protection that it imposed for them is that the release would not be interpreted like an ordinary contract, but would be interpreted under the totality of the circumstances test. The courts have layered protections on individuals to protect them from coercive releases such as releases to give up your job every day in order to continue to work. Congress then came behind that and codified most of the common law standards and objectified a lot of them in the Older Worker Benefit Protection Act of 1990. The hypothetical employer who is offering releases every day has to give its employees 21 days to consider that release. It has to tell the employees that they should consult with a lawyer.  And it has to write the release in plain language and the release cannot interfere with their federally protected rights to file charges. And then the Supreme Court in Oubre v. Tenergy Corporation says that now if after all those things happen and you want to challenge the release of someone who has required you to sign it every day in order to continue to work, you can keep the consideration. You don't have to return the consideration. And in all of these ways, the courts, the Congress, and ultimately the Supreme Court have protected employees from the hypothetical that EEOC imposes. What they have not done is to change the retaliation provision and to untether the elements of the retaliation claim from the statute in order to create a substantive lawsuit, an illegal release as EEOC asserts in this case. So the hypothetical that EEOC poses is a false hypothetical. It can't happen. And the courts have provided remedies for individuals such as those that EEOC suggests would be subject to retaliatory releases. The elements of retaliation claim are clearly established in the statute and they're repeated throughout decisions of this court. As I understand their argument, they're not focusing on those. They want a per se rule. That's what they argue below and what they argue here. The facial retaliation. They loosely tie their argument to facial retaliation cases, but the facial retaliation cases aren't applicable primarily because there's no facial retaliation in this case. Well, they want to say almost it's anticipatory retaliation. Can there be such an animal or are there cases that support that? No. The statute does not penalize intent. It's written in the past tense. The individual has to take an action in order to be protected. The Supreme Court said in Burlington Northern, this court said in Moore v. City of Philadelphia, that unlike status-based discrimination where we're all protected based upon who we are, that retaliation discrimination is based on what one does and that what one does is required in order to trigger the protections of the statute. I don't understand the EEOC to be re-raising the anticipatory retaliation claim on appeal. Nor do I, Judge Berry. What the EEOC does do, I believe, is it misinterprets the whole principle of facial retaliation. Facial retaliation doesn't free the plaintiff from establishing the elements of the claim. A facial retaliation policy or practice shows the existence of the elements of the claim, such as the Thurman case that the EEOC cites from the Supreme Court, where the policy forbade airplane captains from downgrading to a flight engineer position once they became age 60. It doesn't absolve the plaintiff of showing the elements of an age discrimination claim. The policy establishes the elements of the claim on its face. A policy that forbids females from working around battery chemicals, as in Johnson Controls, facially establishes the elements of the claim. Here, by contrast, the EEOC concedes that whether or not someone signs a release is not per se protected activity. That it depends upon the circumstances as to whether the person is expressing opposition. If the failure to sign a release is not per se protected activity, then differentiations among employees based upon whether or not they sign a release cannot be facial discrimination or per se discrimination by definition. So the facial discrimination cases and the principle doesn't support the EEOC's argument. Now, the case is, of course, different from EEOC versus Board of Governors. In EEOC versus Board of Governors, the EEOC persuaded Professor Lewis to file a charge of discrimination, and once he did, he had taken that action to engage in protected activity, and that triggered the policy which targeted protected activity and withdrew a benefit of employment once the individual engaged in it. This practice, this release of the EEOC, is challenging. It does not target in any way protected activity. The idea that the company somehow withdrew a benefit when it said that you're fired, but as EEOC says, you can't continue your career unless you sign a release is counterfactual. I think that the best explanation of this is the district court case in Washington. Let me just jump in there. You're saying it's counterfactual because the folks that chose option 3 also signed a release and they were not continuing their career with Ball State? Well, that's one reason it's counterfactual. Another reason it's counterfactual is that the position, the EEOC's argument is that one day I'm at this podium as an employee and the next day I'm at this podium as an independent contractor, and there's functionally no difference. So the case really does come down to the legal distinction between employer-employee, master-servant on the one hand and independent contractor on the other? No, I don't believe so. I believe that this is one of the ways that the EEOC's case fails, but it fails also for an absence of protected activity and for the other reasons that I've already discussed. And the fact that their principle of retaliation emanates from their view of the general purpose of the anti-retaliation provision and not from the anti-retaliation provision language itself. And in the Nassar case last year, the Supreme Court said, no, no, no, don't tread there. Congress very carefully crafted this anti-discrimination principle and the court should confine it to the elements of the anti-retaliation claim. What I'm referring to with respect to the suggestion that the position remains the same is that it too fails on that basis. Because what the individuals were offered was not an opportunity to keep doing the same job, but also an opportunity to not do any job, that they were free as business owners at that point to hire other insurance agents to do the work. And if the agent was successful, the agent could continue to operate an insurance agency, but without selling any insurance, him or herself. It's the difference between a business owner and an employee. And the individuals were offered benefits in order to become a business owner and they could either take that, that would require the signing of the release, or not take it. But it's not the hypothetical that EEOC says that you should be concerned with, and that is the employee who's requiring a release in order for an individual to continue to work. Do the numbers of agents that selected each of the respective options affect our evaluation of the case in any way? In other words, the popularity of the conversion? No, it's not relevant to the elements of a retaliation case, but I can tell you that 12 of the 30 Romero plaintiffs took the sell option. They decided that they wanted to leave the company and they converted for a period of 30 days. Sold their book of business. Well, first they took an interest in the book of business, which they did not have. They had no right to sell. Then they sold their book of business for, I think we put in the brief, from a low of $75,000 to a high of $435,000 per agent. And that 17 of the Romero plaintiffs took the option of becoming an independent contractor and later sold their books of business somewhere between the time that they converted and now, between $75,000 and over $900,000 per agent. Is the base service option the fourth option? Is that at issue here, or is that no longer? Well, the agents were not entitled to any severance pay upon termination. Allstate offered $13,000 base severance pay. And then if the individual would sign release, then they had the other three options available to them. I believe it said up to 13 weeks pay. Why was that up to? It wasn't clear to me how that would be calculated for those that chose the base severance. I don't know, and I don't remember that as being the fact, but I take it that you've read that portion more carefully. I cannot answer your question. Okay. The EEOC has brought other cases. I think they're referenced in the amicus briefs of the U.S. Chamber of Commerce attacking releases in other ways. In the Sundance case in the Sixth Circuit, they challenged that the release was retaliatory because it impeded the right to file EEOC charges. The court there found that the retaliation did not occur. I think I need to mention also the Seventh Circuit's opinion in Isbell versus Allstate. Same facts, same case, different circuit. Is there any distinction between this case and Isbell? No, sir. The EEOC argues that there is a distinction between the cases in that they say that the Seventh Circuit did not decide the same issue that they're arguing here. They say that what the Seventh Circuit did was that it considered whether the terminations themselves, the employment determinations which took place in November 1999 were retaliatory and not the subsequent offer of a new position in exchange for a release, the independent contractor position in exchange for a release. And they quote extensively from two paragraphs of the opinion. We brought to the court's attention the first paragraph of the argument. We brought to the court's attention the first paragraph of the argument, which describes the case the same way EEOC describes its case. What neither party did was bring to the court's attention the Seventh Circuit's conclusion in its opinion where the Seventh Circuit states in a single paragraph, there was not discrimination and Allstate did not retaliate against Isbell when it refused to hire her for one of these new opportunities after she refused to sign her release of liability. It's the same issue, it's the same case decided by the Seventh Circuit. In Allstate's favor, a contrary decision would create a split in the circuit. So this isn't, Isbell wasn't just about Option 4? I thought she chose Option 4 and litigated and so the conversion option wasn't an issue. You're saying that after that she then tried to... No, Isbell didn't sign the release and argued that the conversion option, Option 1, was retaliation. Same argument that EEOC is making here. But wasn't the Seventh, I thought the Seventh Circuit's ground of decision in Isbell was that there was no violation in respect to her treatment on Option 4. She chose Option 4, but it was the existence of Option 1, which she argued in her briefs and to the court, made the release itself retaliatory. She argued retaliatory per se. She also argued that Board of Governors controlled her case. It's interesting that Judge Mannion wrote the Isbell opinion and he was on the panel in the Board of Governors case and he does not accept that Board of Governors controlled the case in favor of Isbell. If there are no other questions... Okay, thank you very much, Mr. Livingston. We'll hear Mr. Ramshaw on the bottle. Thank you. Isbell and Board of Governors are obviously important cases here. A number of... But they're wrong, in your view. Well, Isbell is distinguishable because... Board of Governors is... No, we don't say Board of Governors is wrong. Isbell, yeah, we believe was decided wrongly, but the important thing here is whether you would have to disagree with it. When you look at the two... I think it's actually one paragraph. In the Board of Governors, in the Isbell position, the reason... Okay, counsel's right. Isbell did not sign the release and she argued that the arrangement was retaliatory because she wasn't allowed to continue, she wasn't allowed to convert to independent contract status because she didn't sign the release. And the Seventh Circuit accurately described her claim that way. But then when it rejected her claim, it said, it's not retaliation because they did not terminate her because she didn't sign the release. They didn't say it was not retaliation because they didn't... But how does that help you? Because none of the 6,200 were terminated because they didn't sign the release. They were all terminated before the company knew whether they would sign the release. Right. That's why Isbell was wrongly decided because in focusing on why they were terminated, it missed the point. The question was why they were prevented from converting. The Isbell court did not say that there was no retaliation because she was prevented from converting because she didn't sign the release. That's why she was prevented from converting. You had to sign the release in order to convert. But... So, I don't know how you would want to handle that, but it's quite a different claim, in my view. Board of Governors was not a case seeking individual relief. You have but to read it. It starts talking about retaliatory policy and it does it throughout and it talks about retaliatory policy at the end. And look at footnote 2 in that decision. It says, when the commission threatened litigation, the Board of Governors restored, reinstated, Professor Lewis's arbitration proceeding, his grievance proceeding. Therefore, if that had really been a commission case just seeking relief for Professor Lewis, it would have been moved. He already had his... And when the Board of Governors, at the end of the Board of Governors' decision, it instructs the district court to grant the injunction that the commission was seeking to change the policy. Uh... Do you agree with what was said earlier, that the anticipatory retaliation argument is no longer an issue? I think that's... Yeah, I think, yes. Yeah, that's... So, really, we're focused on the one issue, which is that this is facially... The program itself was... I'm sorry. The conversion option was facially retaliatory. There are two issues. One is, should employers be permitted to require releases in order to continue working for a company? Well, but if we maintain the independent contract or employer-employee distinction, then that goes out the window, right? Again, I don't think it should, no. Well, maybe it shouldn't, but it has to. If... We need to break down that wall. Your brief was all about breaking down that wall of legal distinction between the two concepts, was it not? So that you're saying... You could agree that it would have been impermissible if option one was to continue as an employee... Right. ...but say that this was okay because they weren't continuing as employees. And I think you need to look at the economic reality. Right, that's what I'm saying. You want us to note sort of the practical aspect of the case, the economic reality, and disregard the legal significance as to what it means to be an independent contractor. But the fact that what they became was an independent contractor does not affect whether it was retaliatory for Allstate to require them to sign the release. In order to continue working in any capacity. Your primary argument is that this is a facial retaliation claim. Yes. It's a per se rule, I think. Yes. And if you lose on that, then you go to the traditional retaliation factors. As to the non-signers. As to those who, quote unquote, refuse to sign. Right. So there are two different arguments. But only if you lose the facial retaliation claim do you raise the traditional, the substantive. Yes, that's correct. And that would cover only a few of the employee agents because only 20 or so of them did not sign. But again, it... I'm sorry, I'm out of time. Let me just ask one other question. Do you agree that Allstate's offer to work with the agents as independent contractors was valid consideration in exchange for release? Yes. Yeah. But we don't believe it. And we agree that the normal rule, again, the question is, was this a normal termination setting? In a normal termination setting, you can offer enhanced benefits in exchange for release. But what makes this the abnormal setting? Just the quantity of employees? The size of the company? Bargaining power? The fact that what... Because most of the employee agents continued to be insurance agents for Allstate. Well, that might work against you. That might just mean they offered them a really nice option. Everybody but 18 was terminated. Well, all 6,200 were terminated. Yeah, all except 18 for various reasons. 18 were not. No, they were terminated too. They just didn't sign the release. All the agents were terminated. And then if you signed the release, you got a choice of three options. Okay, I'm sorry. For all practical purposes, 6,200 were terminated. Yes, yes. And if they really didn't need insurance agents anymore and those people really went away, then that's why options 2 and 3 would have been okay. Those were enhanced severance benefits for people who weren't going to be insurance agents anymore, and they could get a release for those enhanced benefits. But what we believe an employer can't do is require people to sign a release in order to keep on doing their jobs. But they had to terminate. Yes. Yes, but the overall... So they can't continue doing their jobs. They're out with coal. They have nothing. They're unemployed. But when you look at the facts here, that's not what happened. They sold insurance as employees up until June 3. It just seems like the harm keeps coming back to the fact that the company had the power to cashier all of its agents without recrimination. Didn't owe them anything. They were in an exceedingly weak... The agents were in an exceedingly weak bargaining posture to begin with. They weren't entitled to severance, future employment, continue working, health care. They were as well employees. Right, they were. Right, right, but the question is... And that's what sets in motion all of the coercive aspects of this plan, is the fact that they had nothing. But you have to put that together with the fact that Ball State did not really want them all to go away. It needed most of them to stay, and they did. But thank you, Your Honors. Thank you, Mr. Ramshaw. The court thanks both counsel for the excellent argument and briefing. We'll take the matter under advisory.